IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

PAULETTE GABBIDON,
a.k.a. PAULETTE HIBBERT,

    Plaintiff,

v.                                    CIVIL ACTION NO. 1:19-00828

DAVID R. WILSON, FPC ALDERSON;
JERROD R. GRIMES, FPC ALDERSON;
LIEUTENANT WORKMAN, FPC ALDERSON;
GINA HONAKER, FPC ALDERSON;
MARK S. INCH, FEDERAL BUREAU OF
PRISONS; AND, THE UNITED STATES
OF AMERICA,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, plaintiff alleges that while she was incarcerated in federal prison, a captain at the prison sexually assaulted her on numerous occasions and forced her to do personal labor for him.  She sued several defendants, including the United States ("defendant"), which responded to the amended complaint with a motion to dismiss/motion for summary judgment, asserting that plaintiff's claims under the Federal Tort Claims Act ("FTCA") were time-barred because she did not file within six months of receiving a final denial of her claim from the Bureau of Prisons ("BOP").  Plaintiff opposed the motion on alternative grounds.  The court rejected plaintiff's argument

that her complaint was timely filed[1] but found that questions of
fact regarding tolling under equitable principles precluded
entry of summary judgment.  (See ECF No. 57, at 26.)

Defendant moved to bifurcate trial to resolve the disputed
factual matters pertaining to tolling (and the ultimate
applicability of tolling to the facts) prior to trial on the
merits.  Plaintiff did not file a response, and, for good cause
shown, the court granted the motion.

The court held a bench trial on July 18 and 19, 2022.  The
parties' witnesses provided contradictory accounts of the facts
pertinent to tolling.  After a careful review of the evidence,
the court finds that it does not bear out the narrative that
plaintiff provided at the summary judgment stage.  Plaintiff has
failed to carry her burden of proving that equitable tolling or
equitable estoppel applies to save her untimely claims against
the United States.

Additionally, even if the court were to credit the evidence
that plaintiff presented at trial over the (more persuasive)
evidence that defendant presented, tolling would not apply
because plaintiff had the benefit of multiple attorneys at all
relevant times and made a conscious decision to stop diligent

---

[1] The court found, however, that as to the claim relating to
forced labor, the complaint was timely.  (ECF No. 57, at 18.)
Defendant has filed a motion for summary judgment as to the
forced-labor claim, which is pending.

2

pursuit of her tort claims in the hope that doing so would benefit her pursuit of U nonimmigrant status (help her obtain a U-Visa).  Furthermore, even assuming (as the court did previously) that fear of retaliation may be grounds for equitable tolling in some instances, this is not one of them. The "retaliation" that plaintiff feared was that the United States and its agents would (1) apply straightforward immigration law to the facts of plaintiff's case, and (2) decline to assist plaintiff with her U-Visa application.  A fear of such "retaliation" does not constitute extraordinary circumstances beyond plaintiff's control so as to prevent her from filing a timely lawsuit.  Finally, the record shows that plaintiff did not diligently pursue her claim.

## I.   Witnesses

The following six witnesses testified at trial, either in-person or by videoconference:

1.   <u>Lisa Haba</u>:  Ms. Haba served as plaintiff's attorney in plaintiff's immigration proceedings.  Plaintiff retained Ms. Haba in May 2019 and had ongoing access to Ms. Haba's legal advice throughout her immigration proceedings.  Ms. Haba testified by videoconference.

2.   <u>Paulette Gabbidon a.k.a Paulette Hibbert</u>:  Ms. Gabbidon is the plaintiff.  She resided in the United States from 1985 to November 21, 2019, when she was deported.  She

3

currently resides in Dubai, United Arab Emirates.  She testified
by videoconference.

3.  Rose Feller:  Ms. Feller is one of plaintiff's
attorneys.  Plaintiff retained her in early 2018.  At all
relevant times, Ms. Feller had ongoing contact with plaintiff
regarding her tort case, including her claim against the United
States under the FTCA.  Ms. Feller filed multiple FTCA claims on
plaintiff's behalf and corresponded with a Department of Justice
attorney regarding the claim.  Ms. Feller was disqualified from
representing plaintiff during this phase of the bifurcated trial
because she was a witness to disputed facts bearing on equitable
tolling or equitable estoppel.  She testified in person.

4.  Melissa Westendorf, Ph.D.:  Dr. Westendorf was
qualified as an expert in clinical psychology.  Plaintiff
retained her in 2021, well after she had been deported.  Dr.
Westendorf performed a psychological evaluation of plaintiff
based on a review of plaintiff's medical records and two
interviews of plaintiff.  Dr. Westendorf had no firsthand
knowledge of the disputed facts bearing on equitable tolling,
and her opinion regarding the reasonableness of the plaintiff's
fear of "retaliation" was not disclosed in her expert report.
She testified by videoconference.

5.  Diana Lee:  Ms. Lee is Deputy Regional Counsel for the
U.S. Bureau of Prisons' Mid-Atlantic Regional Office.  She has

4

worked for the Bureau of Prisons since 2003.  Prior to that, she
was an active-duty JAG officer from 1996 to 2001 and was in the
reserves until 2016, retiring with the rank of Lieutenant
Colonel.  She worked for the U.S. Department of Labor from
approximately 2001 to 2003.  During most of her extensive career
in public service, a part (and sometimes a very large part) of
Ms. Lee's work has involved analyzing and resolving
administrative tort claims against the United States.  Under a
narrower definition of such claims, she has resolved
approximately 500 of them, and on a broader definition, she has
resolved thousands.  She testified in person.

6.   Alan Young:  Mr. Young is a deportation officer with
U.S. Immigration and Customs Enforcement, a position he has held
since 2015.  Mr. Young was assigned as plaintiff's deportation
officer in 2019.  During the timeframe of this assignment, Mr.
Young would have been assigned to 200 or more detainees such as
plaintiff.  He testified by videoconference.

**II.  Findings of Fact**

1.   On October 27, 2011, plaintiff pleaded guilty to one
count of conspiracy to commit bank fraud, in violation of 18
U.S.C. § 1349, and thirteen counts of bank fraud, in violation
of 18 U.S.C. §§ 1344 and 2, in the U.S. District Court for the
Southern District of New York.  She was sentenced to 100 months
of imprisonment and was later resentenced to 90 months of

imprisonment.  (ECF No. 143-3.)  Her judgment included an order
of restitution and, as of the time of trial, she owed
approximately $4 million in restitution.  (Id.)

2.   In 2015, plaintiff was incarcerated at FPC Alderson,
where she alleges that former Captain Jerrod Grimes ("Grimes")
raped her on numerous occasions in 2016 and 2017 and that others
failed to intervene.  She also alleges that she was forced to
work without compensation.  Plaintiff retained Attorney Rose
Feller to represent her in connection with her claims against
Grimes and others, including the United States.[2]  Ms. Feller had
never submitted an administrative claim under the Federal Tort
Claims Act prior to that time.  Plaintiff was reasonably able to
confer with Ms. Feller from when she retained Ms. Feller in
early 2018 through when the complaint was filed in late 2019.

3.   Ultimately, Ms. Feller filed several administrative
claims regarding the allegations giving rise to this case.  Only
one of them really matters here:  the claim that was received by
the Bureau of Prisons ("BOP") on September 26, 2018 (the
"September 2018 claim") and accepted under identification number
TRT-MXR-2018-05750.  (See ECF No. 148-10.)  In this claim,
plaintiff stated that on various dates in 2016 and 2017, former

---

[2] Ms. Feller also ended up entering an appearance, pro hac vice,
in plaintiff's federal criminal case in the Southern District of
New York.

Captain Jerrod Grimes "repeatedly raped, tortured, and discriminated against" her, and she listed $12,873,050 as the sum of her damages.  (Id.)

4.    On September 27, 2018, the BOP acknowledged receipt of plaintiff's claim and sent a letter to Ms. Feller advising that the BOP had six months from the date the BOP received the claim to review, consider, and adjudicate the claim.  (ECF No. 148-11.)  BOP Mid-Atlantic Deputy Regional Counsel Diana Jacobs Lee was assigned to the September 2018 claim.  In the months that followed, Ms. Feller called Ms. Lee approximately once a week to discuss the claim.  The typical phone call was essentially a monologue by Ms. Feller expressing her opinions about the claim and why it should be settled for millions of dollars, immediately.  There was a hiatus in the phone calls when the federal government shut down near the end of 2018.

5.    Recognizing that plaintiff's claim would not be settled administratively, Ms. Lee issued a final denial letter on January 28, 2019 (the "January 2019 denial letter"), shortly after the federal government reopened.  The letter was sent via certified mail and stated as follows:

> The administrative claim filed with the [BOP] under
> the [FTCA] on behalf of your client, has been
> considered for administrative settlement.  You claim
> government liability in the amount of $100,000,000.00[3]

_____

[3] Due to a clerical error, the denial letter stated that the administrative claim had demanded $100,000,000.00.  This amount

7

> for personal injuries your client allegedly sustained
> at the Federal Prison Camp in Alderson, West Virginia.
>
> Your claim is denied.  If you are not satisfied with
> our determination in this matter, you may file suit in
> the appropriate U.S. District Court not later than six
> months after the date of this letter.

(ECF No. 148-12.)

6.    So far as the record shows, plaintiff's only pending claim at the time of the January 2019 denial letter (the only claim that had not been rejected or denied) was the September 2018 claim.  Thus, despite the clerical error in the amount listed, the January 2019 denial letter unambiguously denied the September 2018 claim.  Because the May 2018 claim (listing $100,000,000.00) had been rejected as procedurally insufficient on July 17, 2018, plaintiff was not awaiting a denial of that claim.  (See ECF No. 148-9.)  Any assumption that the January 2019 denial letter was not a rejection of the September 2018 claim was unreasonable.

7.    Nevertheless, Ms. Feller testified that she was concerned that the incorrect claim amount ($100,000,000.00) on the January 2019 denial letter might preclude her from filing a

---

was actually $12,873,050.00.  The error derived from the fact that Ms. Feller had previously (in May 2018) submitted a claim for $100,000,000.00.  The BOP had rejected that claim as procedurally deficient for failing to specify the dates when plaintiff sustained the alleged injuries.  That rejected claim was assigned the same claim number as was assigned to the September 2018 claim, which was accepted as procedurally sufficient but denied on January 28, 2019.

lawsuit.  Even if Ms. Feller's concern were a reasonable basis
to delay the filing of a complaint, it would be entirely
unreasonable to continue in such a holding pattern past March
26, 2019, when plaintiff could deem the September 2018 claim
denied by operation of law.  See 28 U.S.C. § 2675(a) ("The
failure of an agency to make final disposition of a claim within
six months after it is filed shall, at the option of the
claimant any time thereafter, be deemed a final denial of the
claim for purposes of this section.")  Any purported problem
with the denial letter would have had no effect on plaintiff's
ability to commence her lawsuit after March 26, 2019.

8.   Ms. Lee did not engage in further communications with
Ms. Feller during the six months that followed the issuance of
the January 2019 denial letter.  Ms. Feller's testimony to the
contrary was not credible.  It appears, however, that Ms. Lee
spoke with someone from Ms. Feller's office soon after the
issuance of the January 2019 denial letter and explained that
because the demand amount was not material to the denial letter,
she would not be sending a corrected denial letter.  (See ECF
No. 148-14.)

9.   On or about October 1, 2019 (well after the six-month
limitations period had passed), Ms. Lee received a voicemail
from Ms. Feller requesting an updated denial letter to reflect

damages claimed in the amount of $25,000,000.00[4] rather than the
$100,000,000.00 amount reflected in the denial issued on January
2019 denial letter.  Ms. Lee responded by email on October 1,
2019.  (See id.)  Ms. Lee explained that the BOP considered
claim TRT-MXR-2018-05750 to be finally denied on January 28,
2019, and informed Ms. Feller that no updated denial letter
would be forthcoming because the dollar amount in the January
2019 denial letter was not a material part thereof.  (Id.)
Rather, Ms. Lee stated that the amount listed on plaintiff's
administrative tort claim form would act as the damages cap if
the matter proceeded to trial.  (Id.)

    10.  Ms. Feller responded to Ms. Lee by email on October 2,
2019, recounting an alleged telephone conversation wherein she
had understood that Ms. Lee would be sending a corrected denial
letter.  (Id.)  Ms. Lee responded by email the same day, denying
the alleged conversation and stating that the claim had been
closed and would not be reopened or reconsidered.  (Id.)  Ms.

---

[4] Ms. Feller stated in her sworn declaration that she presented
an oral demand of $25,000,000.00 after the issuance of the
January 2019 denial letter (which had denied a claim for roughly
half that amount).  Ms. Feller further stated that she made the
oral demand in a conversation wherein Ms. Lee made an informal
offer of $1,000,000.00 (again, supposedly after the claim had
been denied).  (ECF No. 42-1, at 23.)  Ms. Feller similarly
testified at trial she presented an oral demand for
$25,000,000.00 after the issuance of the January 2019 denial
letter and that Ms. Lee said that she would get back to her but
never did.  This testimony was not credible.

Feller responded by email the same day, stating of the alleged conversation, "Regardless it happened and was heard and documented by my staff and self."[5]  (Id.)  Ms. Feller further requested an immediate phone call by Ms. Lee or her "superior" and suggested that Ms. Lee was employing a "delay tactic." (Id.)

11.  In her sworn statement, Ms. Feller stated that she received an informal settlement offer from Ms. Lee of $1 million.  (ECF No. 42-1, at 23.)  In her sworn statement and in her trial testimony, Ms. Feller stated that Ms. Lee had told her that plaintiff's file was being transferred across the street from Ms. Lee's office and that Ms. Lee's office had just moved. Ms. Feller's testimony was not credible.  Ms. Lee credibly testified that she did not so inform Ms. Feller.  What is more, Ms. Lee at all relevant times worked in a business park where the surrounding offices support the National Security Agency, so there was no attorney to whom the file could be transferred "across the street."  And the last time Ms. Lee's office moved was in 2007, before she even began working there.

12.  Ms. Lee never told Ms. Feller or her staff that BOP would be reconsidering plaintiff's claim.  Further, Ms. Lee

---

[5] No staff member from Ms. Feller's office testified at trial concerning the alleged conversation, and no documentation was produced at trial memorializing the alleged conversation.

never promised Ms. Feller or her staff that she would send a new denial letter revised to correct the clerical error in the January 2019 denial letter.  Ms. Feller's testimony to the contrary was not credible.  If Ms. Lee had done so, that would initially seem to be grounds for a colorable argument that plaintiff had been lulled into a false sense of security in delaying this lawsuit.

13.  One significant problem for plaintiff (and Ms. Feller) is that a denial letter amending the clerical error would have had no effect on the six-month deadline, which would still be July 28, 2019.[6]  Plaintiff has advanced no authority suggesting that a new denial letter correcting a clerical error would reset the six-month clock.  Thus, plaintiff's argument for tolling based on the supposed promise of a new denial letter is entirely unavailing.

14.  Ms. Feller's narrative that she continued to ask for an updated or corrected denial letter as late as June 2019 makes very little sense.  After March 26, 2019, she could have simply deemed the September 2018 claim denied (administratively exhausted) and filed a complaint.  While Ms. Feller had until

---

[6] Ms. Feller testified that, even as of the time of trial, she understood the six-month deadline to be August 5, 2019 (six months after she received the denial letter).  This is incorrect.  See 28 U.S.C. § 2401(b) (providing that clock starts with date of mailing).

late July to file the complaint, there was no procedural impediment to filing it in April, May, or June, 2019.  Ms. Feller's concern that the denial was deficient was unfounded, but even if it were founded, she would need a corrected denial letter only insofar as she planned to file the lawsuit prior to March 27, 2019, when she could simply deem the September 2018 claim denied.

15.  Additionally, Ms. Feller's sworn declaration and trial testimony conflict as to when she drafted the complaint to commence this lawsuit.  In her sworn statement, she stated that although she had started drafting the complaint when plaintiff instructed her to cease work (supposedly in early June), she had not completed it.  (ECF No. 42, at 26.)  At trial, however, she claimed that she had finished drafting the complaint prior to plaintiff telling her to cease work.  Regardless of which version is correct (if either is), there is no evidence that Ms. Feller was ready to file the complaint prior to March 27, 2019, which would have been the only reason to seek a corrected denial letter.  After March 26, 2019, there was no need for any denial letter at all to proceed with filing a complaint.

16.  In late May, 2019, plaintiff received a notice to appear for immigration proceedings from the U.S. Department of Homeland Security ("DHS").  Plaintiff retained Ms. Haba the same

month to represent her in those proceedings.[7]  Plaintiff was
reasonably able to confer with Ms. Haba throughout the pendency
of her immigration proceedings.  Ms. Haba's research had
indicated that, to the extent plaintiff had previously been
thought to be a U.S. citizen, she was in fact not a citizen.
Presumably, Ms. Haba communicated this to plaintiff.

17.  The Notice to Appear explained that plaintiff must
appear before an immigration judge pursuant to section 240 of
the Immigration and Nationality Act ("INA").  It further
indicated that plaintiff was removable (deportable) because (1)
she was not a citizen of the United States; (2) she was a native
and citizen of Jamaica; (3) she was admitted to the United
States at Miami, Florida, on or about November 4, 1985, as a
lawful permanent resident; (4) she was convicted on December 16,
2013, for the offense of conspiracy to commit bank fraud in
violation of 18 U.S.C. § 1344; and (5) she was subject to being
removed (deported) under Section 237(a)(2)(A)(iii) of the INA
for being convicted of an aggravated felony as defined under the
INA that involved fraud and/or deceit in which the loss to the
victim exceeded $10,000 or which involved a revenue loss to the
government exceeding $10,000 and that the conviction related to

---

[7] Prior to that time, it appears that Ms. Feller was attempting
to assist plaintiff with issues relating to immigration.
Eventually, Ms. Feller realized that the issues were beyond her
scope of knowledge and referred plaintiff to Ms. Haba.

an attempt or a conspiracy to commit an aggravated felony as
defined under the INA.

18.  On June 21, 2019, plaintiff and Ms. Haba appeared for
a Master Calendar Hearing before an immigration judge by video
teleconference.  Plaintiff and her counsel requested a
continuance for additional attorney preparation and to apply for
a Form I-918 Nonimmigrant U-Visa ("U-Visa").  The immigration
judge granted that request.

19.  On July 29, 2019, plaintiff and Ms. Haba appeared for
a second Master Calendar Hearing before the immigration judge.
Plaintiff, through counsel, admitted at the hearing the facts of
her removability (deportability) and conceded that she was
removable (deportable) as set forth in the Notice to Appear.
Plaintiff and her counsel requested a second continuance for
additional time to present her U-Visa petition.  DHS did not
oppose that request.  The immigration judge granted that request
for additional time.

20.  On August 23, 2019, plaintiff and her counsel appeared
for a third Master Calendar Hearing.  Plaintiff and her counsel
requested a third continuance to await a prima facie
determination regarding her U-Visa petition.  DHS opposed this
request.  The immigration judge denied the request for a
continuance.  On August 27, 2019, the immigration judge ordered
that plaintiff be removed (deported).  After filing an untimely

15

appeal, plaintiff was removed from the United States and
deported to Jamaica on November 21, 2019.

21.  At the summary judgment stage, plaintiff's best
alleged fact in support of tolling was that an Immigration and
Customs Enforcement ("ICE") agent had instructed her to tell her
attorney to cease work on her civil case.  In her sworn
affidavit, plaintiff stated,

> Early in June, [ICE] Agent Young pulled me into this
> office[8] and warned me that I "needed to call my
> attorney right away and tell her to stop whatever it
> is that she's filing because they are watching you and
> call every day."  I immediately called Attorney Feller
> and asked her to not move forward with my claim
> against the BOP until my immigration case had been
> settled.

(ECF No. 42-1, at 39 (emphasis added).)

22.  At trial, plaintiff modified this version of events to
say that the conversation actually took place in a hallway.
Also, at trial, plaintiff revised her previous version of what
Mr. Young had said to eliminate its ambiguity, testifying that
Mr. Young specifically identified Ms. Feller as the attorney
whom she needed to call right away and instruct to cease work.

23.   Ms. Feller likewise testified to a version of Mr.
Young's alleged statement that removed the ambiguity in the

---

[8] In her opposition memorandum, plaintiff stated that she had
been pulled into "his office," so presumably this is a typo in
the declaration.  In any event, plaintiff stated under penalty
of perjury that the conversation took place in an office.

earlier version.  According to Ms. Feller, Mr. Young made it obvious that Ms. Feller was the attorney who needed to cease work.  Ms. Feller also claimed that Mr. Young explicitly told plaintiff that if she did not stop pursuing her tort claim, she would be deported.  Ms. Feller's testimony in this regard was not credible.[9]  Moreover, Ms. Feller evidently put forth no significant effort to confirm with Mr. Young what his "threat" meant or to seek protection for her client from the "threat." Simply standing by while an ICE agent was allegedly threatening her client (and thereby preventing her from pursuing her tort claim) suggests a lack of due diligence under the first prong of the test for equitable tolling.[10]  See Davis v. Jackson, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *11 (S.D.N.Y. Sept. 30, 2016) (stating that court would be "hard pressed" to find diligence prong satisfied if plaintiff did not diligently seek protection from alleged threats of retaliation).

---

[9] After purporting to relate what Mr. Young's exact words were, Ms. Feller acknowledged that she could not provide the specifics of what he allegedly said because she was not a party to the conversation.

[10] Plaintiff testified the Ms. Feller told her she would contact Mr. Young and that Ms. Feller tried to do so, but there was no persuasive evidence that Ms. Feller made any significant, diligent efforts to seek protection from the supposed threat to her client.  Plaintiff did not testify that she asked Ms. Feller to refrain from following up with Mr. Young.

24.   While the record leaves open the possibility that Mr. Young said something that plaintiff misinterpreted as a warning against further pursuit of her tort claim, it is clear that (1) Mr. Young did not explicitly instruct plaintiff to stop pursuing her tort claim; and (2) Mr. Young had no intent to cause plaintiff to stop pursuing her tort claim.  Mr. Young did not even know that plaintiff had a tort claim against the United States.  While Mr. Young was unable to recall all conversations with plaintiff years later, his testimony regarding what he did not say was nevertheless credible.

25.   Plaintiff admitted to the immigration judge that she was deportable on July 29, 2019, the day after the six-month limitations period under 28 U.S.C. § 2401(b) expired for filing a complaint on her tort claim against the United States.  The immigration judge found removability (deportability) established by clear and convincing evidence.  By that date (at the latest), Ms. Haba had advised plaintiff that she was deportable based on her conviction of an aggravated felony and lack of citizenship, under a straightforward application of immigration law.

26.   In other words, Ms. Haba had informed plaintiff that the immigration consequences of her guilty plea (to conspiracy to commit bank fraud) were clear.  Ms. Haba and her client understood, by that time at the latest, that the only viable path to staying in the United States was through a U-Visa.  An

application for a U-Visa requires a law enforcement certification ("LEC"), but whether to issue an LEC is completely discretionary and not subject to judicial review.  See Catholic Charities CYO v. Chertoff, 622 F. Supp. 2d 865, 887 (N.D. Cal. 2008).

27.  In light of the foregoing, even if Mr. Young had said something in early June that plaintiff interpreted as a suggestion that dropping her tort claim would allow her to avoid deportation, it would have been clear to her before the end of July 2019 that her only chance at staying in the United States would be to obtain a U-Visa.  And by then, the only "retaliation" that plaintiff could reasonably be concerned about was (1) the straightforward application of immigration law to the facts of her case; or (2) not receiving an LEC or (ultimately) a U-Visa.[11]

28.  Despite the benefit of two attorneys to explain to plaintiff that the tort claim and the immigration proceedings had no bearing on one another, plaintiff decided to cease pursuit of her tort claim.  Ms. Feller advised her that this

---

[11] Only 10,000 U-Visas may be issued annually, but there is a waiting list for those who would obtain a U-Visa but for the annual cap, and by getting on the waitlist, "the alien is provided deferred-action status and may be granted work authorization."  Gonzalez v. Cuccinelli, No. 19-1435, 2021 WL 127196 (4th Cir. Jan. 14, 2021).  Thus, merely getting on the waitlist for a U-Visa would have been a significant benefit for plaintiff.

decision could lead to forfeiting her tort claim.  But Ms.
Feller also seemed to buy into the theory that plaintiff was the
object of a wrongful retaliation campaign by a web of government
agents seeking to do Grimes's bidding.  Ms. Feller's sworn
declaration at the summary judgment stage stated,

> [Plaintiff] asked me to hold off on taking additional
> steps in regards to her civil case against the BOP.
> At this point I had already started drafting the
> complaint and was still having my office call the BOP
> in attempts to secure a written denial on the oral
> $25,000,000 demand.  The only reason I did not
> complete, file the complaint and continue to call the
> BOP was a result of the phone call, as I agreed with
> [plaintiff] and believed that she was being punished
> through her immigration case for steps we were taking
> in this case.

(ECF No. 42-1, at 26-27.)  At trial, Ms. Feller continued to
suggest that she believed to be valid plaintiff's concern that
continued pursuit of her tort claim would jeopardize her ability
to stay in the United States.

28.    29.  However, there was no persuasive evidence of a
government conspiracy to deport plaintiff as punishment for
reporting misconduct or pursuing a tort claim against the United
States.  Plaintiff's immigration proceedings were a
straightforward application of immigration law to the facts of
plaintiff's case.  Ms. Haba understood that, and it would have
behooved Ms. Feller to confer with Ms. Haba before concluding
that plaintiff was being "punished" or concurring in the
reasonableness of plaintiff's decision to heed the purported

"threat" from Mr. Young.  Ms. Haba provided plaintiff with
sufficient advice regarding her immigration proceedings that
there could not be reasonable fear of "retaliation" past July
2019.

30.  On August 15, 2019, Assistant U.S. Attorney John L.
File (the lead prosecutor in Grimes's criminal case) sent a
letter to the sentencing judge in plaintiff's case explaining
why he would not sign a Supplement B (LEC) in support of
plaintiff's U-Visa petition.  This explanation was in response
to a request from the sentencing Judge.  Ms. Haba was copied on
Mr. File's letter, and Ms. Haba shared the contents of the
letter with plaintiff.

31.  On plaintiff's behalf, Ms. Haba submitted an
application for a U-Visa on August 22, 2019, that was received
on August 27, 2019.  The application did not contain a signed
Supplement B because Ms. Haba had been unable to obtain a
signature from anyone qualified to sign one.

32.  On plaintiff's behalf, Ms. Haba filed an emergency
motion for a stay of removal on November 18, 2019.  (ECF No.
149-11.)  The motion requested a stay of removal pending
plaintiff's appeal and motion to reopen.  Although plaintiff had
an appeal pending at that point, it had been filed over a month
late.  (ECF No. 149-9.)  And the record does not show that
plaintiff ever filed a motion to reopen.  On November 20, 2019,

21

the Board of Immigration Appeals denied the request to stay removal pending a decision on plaintiff's untimely appeal.  (ECF No. 149-8.)

33.  On November 21, 2019, plaintiff's petition for a U-Visa was denied.  (ECF No. 149-13.)  The same day, plaintiff was deported.  (ECF No. 150-3.)  On November 22, 2019, the Board of Immigration Appeals denied plaintiff's immigration appeal as untimely.  (ECF No. 149-9.)  On December 11, 2019, U.S. Citizenship and Immigration Services issued its decision explaining that plaintiff's petition for a U-Visa was denied because it did not include a signed Supplement B (LEC).  (See ECF No. 150-6.)

34.  In October 2020, plaintiff was issued a Jamaican passport.  On her passport application, she stated that she was an architect.  Although plaintiff has studied architecture, she is not a licensed architect.  Plaintiff was a resident of the United Arab Emirates as of the time of trial.

35.  Plaintiff stated in her sworn affidavit at the summary judgment stage, "After I realized that I had no other options regarding my immigration status, I advised Attorney Feller that I felt comfortable moving forward with my claim against the BOP."  (ECF No. 41-1, at 40.)  While the timing is vague, it is relatively clear from this statement that plaintiff "felt comfortable moving forward with [her] claim" (that is, would no

longer have any basis for equitable tolling) before she was deported. Thus, it is disingenuous for plaintiff to ask the court to find that "[w]hile Plaintiff allowed Attorney Feller to make small efforts to reissue the claim in October 2019, Plaintiff was not comfortable with filing the claim in federal court until after her deportation." (ECF No. 138, at 24.) To the extent plaintiff attempted to show at trial that she withheld authorization from Ms. Feller to file a complaint until she was deported, this attempt was entirely unconvincing.

36. Plaintiff's narrative does not add up. She contends that fear of "retaliation" made her unable to pursue her claim until she was deported, so the complaint was filed the day she was deported. But Ms. Feller was pursuing the claim again on plaintiff's behalf as early as October 1, 2019, well before plaintiff was deported on November 21, 2019. (See ECF No. 148-14.) Plaintiff glosses over this problem by asking the court to find that although plaintiff allowed Ms. Feller to move forward with the claim in some regards, she was still withholding her consent to the filing of a complaint in this court. That is implausible. As of October 2, 2019, Ms. Feller was suggesting dishonesty and "delay tactics" by an attorney for the BOP. (See id.) She then proceeded to file three additional administrative claims between November 1 and November 14, 2019.

37.   It defies credulity that plaintiff had granted authorization to Ms. Feller to engage in those efforts but simultaneously withheld authorization to file a complaint in this court.  Moreover, while the client generally controls the objectives of litigation, the attorney is generally responsible for selecting the means to pursue those objectives.  See FL ST BAR Rule 4-1.2, comment note ("On occasion . . . a lawyer and a client may disagree about the means to be used to accomplish the client's objectives.  The lawyer should consult with the client and seek a mutually acceptable resolution of the disagreement. If these efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation.  See rule 4-1.16(b)(2).  Conversely, the client may resolve the disagreement by discharging the lawyer.").

## III. Conclusions of Law

1.   Under the Federal Tort Claims Act ("FTCA"), "[a] tort claim against the United States shall be forever barred . . . unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).[12]  This deadline, sometimes referred to as

---

[12] Under 28 U.S.C. § 2675(a), a lawsuit may not be commenced before a claim is presented and denied by "the appropriate Federal agency" or six months have elapsed since presentment of the claim.  Together, § 2401(b) and § 2675(a) "act as

the "six-month rule," "govern[s] litigation against the
Government" and "function[s] as [a] condition . . . on the
Government's waiver of sovereign immunity." United States v.
Wong, 575 U.S. 402, 417 (2015).  An "action" under this
statutory provision is not deemed to have "begun" until a
lawsuit is filed in federal court.  See Raplee v. United States,
842 F.3d 328, 333 (4th Cir. 2016) ("In sum, § 2401(b) requires a
plaintiff to bring a federal civil action within six months
after a federal agency mails its notice of final denial of his
claim.").

        2.   As the court previously found, plaintiff's claims
against the United States not relating to forced labor were
filed in this court after the six-month limitations period.
(See ECF No. 57, at 18.)  Under § 2401(b), plaintiff had until
July 28, 2019, to file suit on those claims.[13]  Plaintiff failed

_____

chronological bookends to an FTCA claim, marking both a date
before which a claim may not be filed and a date after which any
filing is untimely."  Dotson v. United States, 30 F.4th 1259,
1266 (11th Cir. 2022).

[13] At trial, plaintiff appeared to pursue an argument not made in
opposition to summary judgment:  that the January 2019 denial
letter was legally insufficient because of the clerical error in
the amount listed.  To the extent this argument was not waived,
the court now rejects it.  The January 2019 denial letter was an
unambiguous final denial of the September 2018 claim.  Plaintiff
has directed the court to no legal authority to support the
notion that a final denial is invalid because it lists the wrong
claim amount—or to any authority suggesting that a denial letter
must list the claim amount.

to file suit on them until November 21, 2019.  Thus, those
claims are untimely and "forever barred" unless equitable
tolling or estoppel applies to extend the deadline to November
21, 2019.  On this record, neither so applies.

3.    The six-month requirement is "mandatory."  Lee v.
United States, No. 1:19-CV-02037-JMC, 2022 WL 2347079, at *3
(D.S.C. June 28, 2022).  It is not, however, "jurisdictional."
See Wong, 575 U.S. at 412 ("Section 2401(b) is not a
jurisdictional requirement.  The time limits in the FTCA are
just time limits, nothing more.  Even though they govern
litigation against the Government, a court can toll them on
equitable grounds.").  Succinctly, "[t]he FTCA six-month
limitations period is a nonjurisdictional, claim processing rule
subject to equitable tolling."  Ramirez v. United States, 410 F.
Supp. 3d 824, 832 (S.D. Tex. 2019).

4.    There are "'subtle and difficult' differences between
the various equitable doctrines that potentially afford
plaintiffs relief from a limitations period."  Edmonson v. Eagle
Nat'l Bank, 922 F.3d 535, 548 (4th Cir. 2019) (quoting Klehr v.
A.O. Smith Corp., 521 U.S. 179, 192 (1997)).  These doctrines
are (1) fraudulent concealment, (2) equitable estoppel, and (3)
equitable tolling.  Id. at 549.  The first two involve
misconduct by the party invoking the statute of limitations,
while the third does not necessarily involve such misconduct.

See id. at 549.  Only equitable estoppel and equitable tolling
are at issue here.

5.   "Equitable estoppel applies where . . . the defendant
engages in intentional misconduct to cause the plaintiff to miss
the filing deadline."  English v. Pabst Brewing Co., 828 F.2d
1047, 1049 (4th Cir. 1987).  Equitable estoppel necessitates
"conduct taken by the defendant to induce the plaintiff not to
timely file his claim."  Edmonson, 922 F.3d at 549.

6.   Unlike equitable estoppel, "[e]quitable tolling does
not require any misconduct on the part of the defendant."  See
Casey v. United States, 161 F. Supp. 2d 86, 95 (D. Conn. 2001).
But equitable tolling is available "only if the litigant
establishes two elements: '(1) that he has been pursuing his
rights diligently, and (2) that some extraordinary circumstance
stood in his way and prevented timely filing.'"  Menominee
Indian Tribe of Wisconsin v. United States, 577 U.S. 250, 255
(2016) (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)).

7.   "[T]he second prong of the equitable tolling test is
met only where the circumstances that caused a litigant's delay
are both extraordinary *and* beyond its control."  Id. at 257
(emphasis in original).  "The term 'extraordinary' refers not to
the uniqueness of a party's circumstances, but rather to the
severity of the obstacle impeding compliance with a limitations
period."  Smalls v. Collins, No. 20-1099-CV, 2021 WL 3700194 (2d

27

Cir. Aug. 20, 2021).  Importantly, the extraordinary circumstances necessary to invoke equitable tolling must be "external to" the conduct of the party invoking the doctrine. Edmonson, 922 F.3d at 549.

8.    "The doctrine of equitable tolling is to be applied 'sparingly.'"  Dunn v. United States Dep't of Veterans Affs., No. 3:18CV699, 2020 WL 4720044, at *4 (E.D. Va. Aug. 13, 2020) (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)).  It should be applied only to avoid an unconscionable application of a statute of limitations that would result in gross injustice.  See Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000).  Equitable tolling offers no solicitude to claims of excusable neglect.  See Irwin, 498 U.S. at 96.

9.    The Fourth Circuit Court of Appeals has explained that equitable tolling "does not lend itself to bright-line rules." Harris, 209 F.3d at 330.  Courts should decide whether it applies on a "case-by-case basis."  Nguyen v. Inova Alexandria Hosp., No. 98-cv-2215, 1999 WL 556446, at *3 (4th Cir. July 30, 1999).

10.  As to equitable estoppel, it is readily apparent that this doctrine does not save plaintiff's untimely claims.  There was no persuasive evidence that, even if Mr. Young suggested that plaintiff tell her attorney to stop what she was doing, Mr. Young made a misrepresentation reasonably calculated to cause

plaintiff to miss the filing deadline.  Likewise, plaintiff's attempt to show that Ms. Lee engaged in misconduct calculated to cause her to miss the deadline was entirely unconvincing.  To the contrary, the record shows that Ms. Lee's conduct was appropriate in all regards.  In short, plaintiff presented absolutely "no [persuasive] evidence showing duplicity on the part of" the United States.  See Morse v. Daily Press, Inc., 826 F.2d 1351, 1353 (4th Cir. 1987).

11.  Additionally, it "has always been an element of estoppel that the plaintiff actually and reasonably rely on the alleged misconduct in foregoing an assertion of his rights." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128-29 (4th Cir. 1987).  If the party asserting equitable estoppel "had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."  Datastaff Tech. Grp. v. Centex Const. Co., 528 F. Supp. 2d 587, 594 (E.D. Va. 2007).  Further, "it must have been the defendant's misrepresentations, and not the plaintiff's own failure to act, that caused the plaintiff to miss the filing deadline."  Id.  Even if plaintiff had shown duplicity by the United States, she failed to show reasonable reliance on either Mr. Young's or Ms. Lee's supposed statements.

12.   Plaintiff also failed to meet her burden of proof as to the application of equitable tolling.  In its previous order denying summary judgment, this court strongly relied on Judge Karas's persuasive opinion in Davis.  There, a prisoner at Sing Sing Correctional Facility alleged that prison officials mistreated him, including by filing false misbehavior reports against him, for which he was punished with loss of privileges, loss of good time, and placement in the special housing unit for 30 months.  Davis, WL 5720811, at *1-2.  The defendants argued that the plaintiff's claims were time-barred.  See id. at *5. The plaintiff argued that equitable tolling should apply because fear of retaliation prevented the timely filing of his claims. See id. at *8.

13.   The opinion recognized the weight of authority suggesting that "fear of retaliation is not a valid ground for equitable tolling."  Id. at *9.  It also recognized that "fear of retaliation is, at least as a theoretical matter, an impediment that is within a plaintiff's control."  Id. at *10. But the court found that an inmate-plaintiff's fear of taking legal action against those threatening him may nonetheless warrant equitable tolling, concluding:

> Given this unique context and the substantial control
> that correction officers exert over inmates, the
> specter of retaliation, a real and ever-present force
> in an inmate's life, can reasonably be said to be
> outside of an inmate-plaintiff's control.  Thus, the

Court concludes that in the prison context, reasonable
fear of retaliation may be sufficient to constitute
extraordinary circumstances warranting equitable
tolling, particularly if the person threatening
retaliation is a defendant or another official who
could be or was influenced by a defendant.

Id. at *11 (citation omitted).

14.    The court noted, however, that the diligence prong of

equitable tolling would require seeking protection from the

alleged threat of retaliation to an inmate, noting that it was

unclear whether the plaintiff had

alleged facts showing that he exercised reasonable
diligence during the time he felt threatened by
officers at Sing Sing.  Plaintiff does not explain,
for example, when he contacted the superintendent
seeking protection from retaliation.  The timing of
that request is relevant because the Court would be
hard pressed to conclude that Plaintiff exercised
reasonable diligence in pursuing his rights if, for
the entire time Plaintiff alleges he faced a threat of
retaliation, he did nothing to seek protection from
that threat of retaliation.

Id. (record citation omitted) (emphasis added).  Thus, the

plaintiff was granted leave to amend his complaint "to allege

what steps he took to secure the superintendent's assurance that

he would not be retaliated against, when he took those steps,

when the superintendent offered his support, and any other facts

showing that Plaintiff exercised reasonable diligence in

pursuing his claims."  Id. at *12.

15.    After trial, it is clear this case is not Davis.

First, the alleged threat of "retaliation" here was not

sufficiently analogous to the kind of retaliation alleged in
Davis (direct threats of punishment by defendant officers having
control over the plaintiff).  Even if the court credited
plaintiff's testimony as to the alleged warning by Mr. Young,
there would still be no threat of retaliation.  At most, there
would be a threat that the government would apply basic
immigration law to the facts of plaintiff's case and/or that
government actors would not support her U-Visa application.

16.  This is a far cry from Davis, where the plaintiff
alleged the following concerning the officers who had custody
over him:

> (1) that one Defendant told Plaintiff not to "get
> comfortable" upon his return to Sing Sing; (2) that a
> false misbehavior report was filed against Plaintiff
> (and subsequently dismissed) upon his return to Sing
> Sing; (3) that one correction officer frisked
> Plaintiff and told him, "I hope your [sic] not gonna
> write me up for this because I know about you"; and
> (4) that following a search of Plaintiff's cell,
> another correction officer told Plaintiff not to "be
> writing a bunch of shit up around here," and told
> Plaintiff that "you know weapons can be found in your
> cell."

Id. at *11.

17.  To the extent plaintiff relied on erroneous legal
advice from Ms. Feller regarding whether the immigration
proceedings and tort claim were interrelated, such reliance is
not grounds for equitable tolling.  See Menominee, 577 U.S. at

257 (mistaken reliance on district court decision not
extraordinary circumstance outside litigant's control).

18.  Mental conditions are sometimes sufficient grounds for
equitable tolling, but they generally must result in "profound
mental incapacity."  See United States v. Sosa, 364 F.3d 507,
513 (4th Cir. 2004).  And "a plaintiff's experience of trauma,
even significant trauma, cannot on its own legally justify the
potentially indefinite tolling of a statute of limitations."
Stone #1 v. Annucci, No. 20-CV-1326 (RA), 2021 WL 4463033, at
*12 (S.D.N.Y. Sept. 28, 2021).  There must be "mental incapacity
or incompetency" and "a causal link between the mental condition
and untimely filing."  Blount v. Clarke, No. 1:19CV540 (LO/TCB),
2020 WL 4323160, at *4 (E.D. Va. July 27, 2020).

19.  Plaintiff presented evidence that she was not in a
good mental state during the six-month window for filing a
complaint.  For example, she had been diagnosed with PTSD.  Her
attorneys observed some frantic behavior on her part.  And while
her substantive allegations of sexual assault have not been
established in this case, assuming for present purposes that
they are substantially true, plaintiff had undergone significant
trauma during her imprisonment.

20.  There was not persuasive evidence, however, that
plaintiff had a mental health condition that rendered her
incapacitated or otherwise unable to pursue her tort claim.  In

fact, she did pursue her tort claim.  She hired an attorney and consistently conferred with her attorney regarding the claim. She also hired an attorney to represent her in her immigration proceedings.  Having the benefit of two attorneys, plaintiff can hardly say that, whatever mental health issues she faced, they were severe enough to prevent her from pursuing her tort claim. After conferring with her attorneys, plaintiff made the decision not to file her FTCA lawsuit in the time required by 28 U.S.C. § 2401(b).  She could have filed her lawsuit within the six months after the denial of her administrative claim by the BOP. She was aware of her legal rights, and she consciously decided not to pursue her FTCA lawsuit timely.

21.  In Watson v. United States, the Second Circuit Court of Appeals held that it could not "justify the grant of equitable tolling . . . on the ground that [the plaintiff] was (however understandably) focused on avoiding deportation before filing his claim for administrative damages."  865 F.3d 123, 133 (2d Cir. 2017).  The plaintiff in Watson was a U.S. citizen who "was held in immigration custody for three-and-a-half years on the mistaken belief that he was a deportable alien."  Id. at 126.  He had no attorney.  Id. at 133.  The trial court had relied heavily on the fact that government officials consistently told him that he was not a citizen, thereby obscuring his ability to see that he had an FTCA claim.  Id. at

34

132.  The Second Circuit reversed, holding that while this may
have been a hindrance to the plaintiff, it was not a
sufficiently severe obstacle that caused him to miss the
deadline.  Id.

22.  Likewise, here, plaintiff's decision to forfeit her
tort claim in an attempt to gain an advantage in her immigration
proceedings, or simply to focus her attention on those
proceedings, is not grounds for equitable tolling.  She had the
benefit of counsel to explain that the pursuit of her tort claim
and immigration proceedings did not bear on one another.  A
mistaken belief that they were interrelated does not justify
equitable tolling here.  See Menominee, 577 U.S. at 257 (mistake
of law not extraordinary circumstance); Rouse v. Lee, 339 F.3d
238, 249-50 (4th Cir. 2003) ("Moreover, an error by a
plaintiff's attorney which results in the failure to comply with
the statute of limitations does not constitute an 'external
circumstance' for equitable tolling purposes because the
attorney is the plaintiff's agent, and the plaintiff is bound by
the actions of her attorney who is her agent.").

23.  This lawsuit was not filed in a timely manner because
plaintiff made a strategic or litigation decision not to do so
after conferring with counsel.  That is not a basis for
equitable tolling.  See Wood v. United States, No. 1:16CV1033,
2017 WL 722018, at *4 (M.D.N.C. Feb. 23, 2017); Long v. Card,

882 F. Supp. 1295, 1288 (E.D.N.Y. 1995). As explained above, by late July, 2019, the only "retaliation" that plaintiff could reasonably be concerned about was (1) the straightforward application of immigration law to the facts of her case; or (2) not receiving an LEC or (ultimately) a U-Visa.

24. Had there been extraordinary circumstances somewhere along the way, plaintiff was still required (and failed) to commence her lawsuit once such circumstances would have ended. "A grant of equitable tolling, unlike statutory tolling, does not shift the deadline so that each day of tolling results in a one-day postponement of the deadline." Herrera v. Clarke, No. 1:19CV1301 (LO/JFA), 2021 WL 1619340, at *4 (E.D. Va. Apr. 22, 2021); see also Cada v. Baxter Healthcare Corp., 920 F.2d 446, 452 (7th Cir. 1990) ("We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term.").

25. Instead, equitable tolling extends the filing deadline only so far as to provide a litigant an opportunity to "file as soon as reasonably possible" after the conclusion of "the extraordinary circumstances justifying equitable tolling." Herrera, 2021 WL 1619340, at *4.

In Smith v. Davis, the appellant argued for a

"stop-clock" approach to equitable tolling so that whenever
a petitioner is impeded from filing his petition by
extraordinary circumstances while the time period of a
statute of limitations is running out, he may simply add
the time during which he was so impeded to extend the
period of the statute of limitations, regardless whether he
was reasonably diligent in filing his petition after the
impediment was removed.

953 F.3d 582, 586 (2020).

26.   The Ninth Circuit Court of Appeals rejected this

approach as "contrary to Supreme Court precedent and also

contrary to traditional principles of equity."  Id.  The court

further noted that the appellant's proposed rule was "something

much more akin to the uniform, forward-looking actions of a

legislature," rather than a court's application of "principles

of traditional equity."  Id.  This court agrees.

27.   Even assuming that there was a sufficient basis for

equitable tolling at some point in the § 2401(b) six-month

limitations period, there would be no basis for tolling until

November 21, 2019, when plaintiff commenced this lawsuit.  As to

her claim that she was waiting for a new denial letter,

beginning March 27, 2019, plaintiff could have simply deemed the

September claim denied by operation of law and filed suit.  See

28 U.S.C. § 2675(a) ("The failure of an agency to make final

disposition of a claim within six months after it is filed

shall, at the option of the claimant any time thereafter, be

deemed a final denial of the claim for purposes of this

section.").  Any purported problem with the January 2019 denial
letter would have had no effect on plaintiff's ability to
commence her lawsuit after March 26, 2019.

28.  Any extraordinary circumstances would have dissipated
once Ms. Haba informed plaintiff that her case involved
straightforward application of immigration law and that the
success or failure of her U-Visa petition was what would be
determinative.  At that point, failing to pursue the tort claim
would have been, at most, about hoping to gain an advantage in
the U-Visa process or about focusing her efforts on that
process.

29.  According to plaintiff's own sworn statement at the
summary judgment stage, there was a point where she realized her
options had run out.  And Ms. Feller was pursuing the claim
again by early October, 2019 which strongly suggests that
plaintiff was able to move forward with her claim by then at the
latest.  At that point, the further delay in the filing of the
complaint was plainly a strategic choice to attempt to reset the
six-month clock in a legally unsound way, and equitable tolling
would not afford plaintiff further relief.

**IV.  Conclusion**

As explained above, neither equitable tolling nor equitable
estoppel applies here.  As such, under 28 U.S.C. § 2401(b),

plaintiff's claims against the United States not relating to forced labor are "forever barred" and are accordingly **DISMISSED.**

The Clerk is directed to send a copy of these Findings of Fact and Conclusions of Law to counsel of record and any unrepresented parties.

**IT IS SO ORDERED** this 12th day of August, 2022.

ENTER:

David A.  Faber
Senior United States District Judge